IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

STERLING NATIONAL BANK,

           **Plaintiff and
Counterclaim Defendant,**

         **v.**

BERNARD N. BLOCK, TRUSTEE,
*et al.,*

          **Defendant and
Counterclaim Plaintiff.**

Case No. 16 C 9009

Judge Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

This case arises out of an alleged breach of a stock purchase agreement. The parties to that agreement, Defendants Bernard N. Block, Trustee, *et al.,* (collectively, the "Sellers") and Plaintiff Sterling National Bank ("Sterling"), have cross-moved for summary judgment. For the reasons stated herein, Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 134) is denied, and Defendant's Motion for Summary Judgment (Dkt. No. 128) is granted in part and denied in part.

## I.  BACKGROUND

### A.  The Parties

The Court will begin with a brief overview of the parties and the nature of the business at issue, before diving into the details of this contract dispute. There are three corporate entities

involved in this case. The first two are the parties to this litigation: Sterling and the Sellers. The third, Damian, is a company that the Sellers sold to Sterling in 2015.

Before it was acquired by Sterling, Damian was a privately-held corporation that provided short-term payroll funding to temporary staffing agencies (the "Clients"). (Answer ¶ 10, Dkt. No. 20.) Damian's Clients provide temporary employees to other businesses (the "End Users"). (Defs.' Resp. to Pl.'s Stmt. of Facts ("PSOF") ¶ 7, Dkt. No. 142.) Damian offered its Clients two levels of service: "full service" and "money only." (PSOF ¶ 8.) Full-service Clients submitted their workers' hours and hourly wage to Damian at various intervals, and Damian would then pay the temporary employees, withhold the proper payroll taxes, transmit those taxes to the proper jurisdictions, and invoice the End Users, among other services. (PSOF ¶ 9; Pl.'s Resp. to Defs.' Stmt. of Facts ("DSOF") ¶ 15, Dkt. No. 147.) After receiving the invoices, the End Users would transfer the amount they owed to Damian's bank facility, from which Damian would remit payments to its Clients. (PSOF ¶ 10.) For money-only Clients, Damian would pay the temporary workers based on the Clients' invoices, which Damian then transmitted to the End Users. (PSOF ¶ 21.) Damian did not create invoices for its money-only Clients (hence the use of the term "money only"). (PSOF ¶ 11.)

Damian, of course, charged for its services. Though the parties vigorously dispute the details of Damian's billing practices, its business model was essentially as follows: The End Users repaid the amount Damian paid to the temporary workers. Damian charged its Clients a base fee for its services (expressed as a percentage of total billing) and offered a variety of discounts and late fees based on how quickly the Client paid the base fee. (*See* PSOF ¶¶ 13, 17-18.) If the End User paid its invoice within a specified period of time, measured from the invoice date, the Client would only owe Damian the base fee. (PSOF ¶ 18.) If the End User paid its invoices within a shorter period of time, the Client would receive a fast pay discount. (PSOF ¶ 19.) If the End User paid after the specified time period, the Client would owe Damian late fees. (PSOF ¶ 20.)

The contract Damian used with both full-service and money-only Clients is called an "Accounts Funding and Administration Agreement" ("Client Contract"). (PSOF ¶ 12.) The Client Contract was based on a standardized form, but Clients could negotiate conditions such as fees, discounts, and term lengths. (PSOF ¶¶ 12-13.) Full-service Client Contracts included a Schedule of Fees, which identified the base fee and the periods of time that would trigger the fast pay discounts and late fees. (PSOF ¶¶ 17-20.) For full-service Clients, the invoice date started the clock for the

various discounts and fees that might apply. (PSOF ¶ 28.) Money-only Client Contracts contained a "Money Only Addendum," which identified the base fee, any late fees, and the time period applicable to each. (PSOF ¶ 22.) Some money-only Client Contracts started the fee clock not by reference to the invoice date (as Damian did not generate invoices for money-only Clients) but rather by Damian's receipt of labor invoices. (PSOF ¶ 23.)

## B. The Contract at Issue

On February 27, 2015, Sterling acquired Damian from the Sellers pursuant to a stock purchase agreement ("SPA"). (PSOF ¶ 42; *see also* SPA, Ex. A to Answer, Dkt. No. 20-1.) The following SPA terms are most relevant to this litigation: the Sellers represented to Sterling that it was providing a full and accurate picture of Damian's finances, liabilities, and obligations; the Sellers agreed to indemnify Sterling for losses incurred in the case of a breach of those representations and warranties; Sterling agreed to pay $25 million to purchase Damian, $2 million of which Sterling would place into an escrow account for future claims asserted against the Sellers; and both parties agreed to a set of procedures by which they would handle indemnification claims. (*See generally* SPA.)

On July 20, 2015, Sterling learned that a former Damian employee was calling Clients and informing them that Damian had

improperly backdated its Client invoices to shorten the window of time in which the End Users could make early or on-time payments. (DSOF ¶ 30.) Sterling investigated this allegation and learned that in June of 2009, Alvin Block, the founder of Damian, directed that Damian change its invoicing practices. (PSOF ¶ 30.) Specifically, Damian began to date invoices on Sunday, the final day of a given work week. (Answer ¶ 17.) Previously, Damian dated most Client invoices on the first Friday after a work week (five days from Sunday, the end of the work week). (PSOF ¶ 30.) After Damian changed the date on its invoices to the Sunday at the end of the pay period, it did not begin transmitting or delivering its invoices to the End Users earlier than it had before changing the invoice dates. (Defs.' Resp. to Pl.'s Stmt. of Add. Facts ("PSOAF") ¶ 72, Dkt. No. 153.)

Sterling calls this practice improper "backdating"; Sellers call it "conform[ing] the invoice date to the contract date." (Answer ¶ 17.) The Court will refer to it as the "2009 change." As a result of the 2009 change, Clients had a shorter window in which they could obtain early pay discounts or avoid late fees. (PSOF ¶ 33.) Sterling asserts that it was not informed of the 2009 change in Damian's invoice dating practice prior to the closing of the Damian acquisition, and that this lack of information constituted a breach of the SPA. (PSOF ¶ 50.)

## C.  Sterling's Investigation and Indemnification Claim

After learning of the former Damian employee's allegations, Sterling hired the law firm of Wachtell, Lipton, Rosen & Katz ("WLRK") to conduct an investigation. (DSOF ¶ 32.) On approximately August 3, 2015, Sterling sent letters to Damian's remaining Clients (which at this point were Sterling's Clients) that stated, "an issue has come to our attention that may result in a credit to your account," and, "Sterling is in the process of reviewing the data and [is] committed to working through all of the information as soon as practical." (DSOF ¶ 46.) By early August, Sterling had drafted a script that its employees could use to call the Damian Clients and notify them that they may be entitled to refunds. (DSOF ¶ 47.) By August 7, 2015, Sterling decided that if its investigation determined that overcharges took place, it would discharge any liabilities it owed. (DSOF ¶ 48.) On August 10, 2015, a Sterling in-house lawyer circulated a draft "Document Hold Notice," intended to preserve documents for use in the internal investigation. (DSOF ¶ 49.) On that same day, Sterling discussed contacting the U.S. Attorney's Office ("USAO") about the 2009 change. (DSOF ¶ 51.)

On August 11, 2015, WLRK drafted a memorandum for a meeting with the USAO that summarized the facts it had learned so far, including an estimate that the 2009 change had created a $1.2 to

1.5 million "aggregate financial impact" on the Damian Clients. (DSOF ¶¶ 52-57.) The memorandum stated that Sterling intended to calculate and refund the amount of overcharges to the Clients. (DSOF ¶ 54.) It further stated, "[w]e are alerting you because there is a possibility of fraudulent conduct here." (DSOF ¶ 56.) WLRK communicated with the AUSO on August 12, 2015 and conveyed the substance of the memorandum in that conversation. (DSOF ¶ 57.)

On November 3, 2015, Sterling informed Damian Clients that it had hired a forensic consultant—AlixPartners—to determine the amount of any adjustments that may be made. (DSOF ¶¶ 59-60.) AlixPartners eventually informed Sterling that the additional amounts paid by all of Damian's Clients as a result of the 2009 change was between $1.2 and 1.3 million. (DSOF ¶ 57.) Another meeting between WLRK and the USAO took place on December 2, 2015. (DSOF ¶ 61.) The memorandum WLRK prepared for that meeting stated, in part: "Sterling contacted all current clients that were potentially impacted by the changed billing practice. . .. Since we reached out to your office in August, Sterling has completed its investigation into this practice." (DSOF ¶ 63.) The memorandum also stated, "Sterling intends to contact each client that it has determined was affected by this practice and reimburse them the amounts that AlixPartners has determined are owed to them." (*Id.*)

On December 11, 2015, Sterling informed the Sellers that it was invoking the SPA's indemnity clause and requested that the Sellers use the $2 million in escrow to indemnify Sterling for its losses resulting from Damian's backdating practices. (DSOF ¶ 61.) On December 16, 2015, a Sterling executive wrote to the remaining Damian Clients, stating that Sterling's investigation was complete, and stating the amount of refund each Client would receive. (DSOF ¶¶ 64-65.) In a December 24, 2015, letter, the Sellers informed Sterling that they refused to indemnify Sterling. (PSOF ¶ 63.)

Sterling ultimately concluded that 285 of the Damian Clients lost discounts or paid improper late fees due to the 2009 change. (PSOAF ¶ 88.) However, of those 285 Clients, Sterling has only made payments to 68 of them. (*Id*.) To date, Sterling has refunded $799,164.33 to the Damian Clients that remained with Sterling. (PSOF ¶ 68.) It has not reimbursed former Damian Clients. (DSOF ¶ 60.)

### D.  The Instant Litigation

Plaintiff brings eight breach of contract counts under the SPA: (I) material misrepresentation of and failure to disclose Damian's financial condition; (II) material misrepresentation of and failure to disclose Damian's liabilities, obligations, and commitments; (III) material misrepresentation of and failure to

disclose Damian's material breach of its contracts with clients; (IV) material misrepresentation of and failure to accurately report accounts receivable; (V) material misrepresentation of and failure to disclosure potential legal actions against Damian; (VI) failure to provide full and accurate disclosure; (VII) failure to provide notice of material events; and (VIII) failure to indemnify Sterling Bank.

Defendants, in turn, assert four counterclaims against Plaintiff: (I) declaratory judgment action that the Sellers, not Sterling, are entitled to the amount in escrow, that Sterling's December 11, 2015, letter is void, and that the Sellers are entitled to pre- and post-judgment interest at 12 percent annum; (II) Sterling breached the SPA by sending improper notice to the escrow agent; (III) injunctive relief mandating Sterling to instruct the escrow agent to disburse the escrow to the Sellers; and (IV): Sterling breached the SPA by failing to pay a required post-closing adjustment of $35,568.49.

The parties now cross-move for summary judgment. Sterling seeks summary judgment with respect to the Sellers' liability and Defendants' counterclaims. The Sellers seek summary judgment in their favor as to their counterclaims and all of Plaintiff's counts.

## II.  LEGAL STANDARD

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Liu v. T&H Mach., Inc.*, 191 F.3d 790, 794 (7th Cir. 1999) (citation omitted).  A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering Sterling's Motion for Summary Judgment, the Court construes the facts in the light most favorable to the Sellers, and when considering the Sellers' Motion for Summary Judgment, the Court construes the facts in the light most favorable to Sterling. *See First State Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 567 (7th Cir. 2009).

## III.  DISCUSSION

### A.  Is Sterling Entitled to Indemnification?

Counts I through VII of Sterling's Complaint allege that the Sellers breached the SPA by making various untrue representations, warranties, and disclosures. However, the Court need not delve

into these Counts because Count VIII, concerning the SPA's indemnification clause, is dispositive of this matter.

Count VIII of Sterling's Complaint charges that the Sellers breached the SPA by not indemnifying Sterling for its losses stemming from the 2009 change. In the SPA, the Sellers ("the Indemnifying Party") agreed to indemnify Sterling ("the Indemnified Party") for losses incurred due to a breach of the representations and warranties contained in the SPA. (SPA § 8.02.) Sterling agreed to place $2 million of the $25 million purchase price into an escrow account for future indemnification claims, and both parties agreed to a set of procedures through which they would handle indemnification claims. (SPA § 8.05.)

The SPA specifies procedures for two types of indemnification claims: Third Party Claims (brought against the Indemnifying Party by any person who is not a party to the SPA) and Direct Claims (brought by the Indemnified Party on account of a loss that did not result from a Third-Party Claim). (*See* SPA §§ 8.05(a), (c).) The notice procedures for both types of claims are essentially the same: Sterling is required to give the Sellers "reasonably prompt written notice" of the indemnification claim, "in any event not later than [10] days after the Indemnified Party becomes aware of such Direct Claim." (SPA § 8.05(c); *see also* SPA § 8.05(a) (specifying that Sterling must give notice for Third Party Claims

"in any event not later than [10] days after receipt of such notice of such Third Party Claim.").) The failure to give prompt notice "shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party irrevocably forfeits rights or defenses by reason of such failure." (*Id.*) Further, Sterling's notice must "describe the Direct Claim in reasonable detail," include copies of all material written evidence thereof, and indicate the amount, if reasonably practicable, of the loss that Sterling sustained. (*Id.*)

The Sellers argue that Sterling failed to give prompt notice, thus forfeiting its rights to indemnification. The timeline of Sterling's notice is therefore relevant, and the Court will summarize it here. Sterling first learned of the 2009 change on July 20, 2015, from a former Damian employee. (DSOF ¶ 30.) Not knowing the truth of this allegation, Sterling hired WLRK to investigate. (DSOF ¶ 32.) Sterling contacted Damian's remaining Clients on August 3, 2015, to inform them that they may be entitled to a refund. (DSOF ¶ 46.) By August 7, 2015, Sterling decided that if its investigation determined that overcharges took place, it would discharge any liabilities it owed. (DSOF ¶ 48.) Soon after, Sterling discussed contacting the USAO about the backdating practices it had discovered. (DSOF ¶ 51.) In preparation for a

meeting with the USAO, WLRK prepared a memo summarizing what it knew of the 2009 change, including an estimate that the 2009 change had created a $1.2 to 1.5 million "aggregate financial impact" on Damian Clients. (DSOF ¶¶ 52-57.) On August 12, 2015, WLRK conveyed to the USAO the substance of that memorandum. (DSOF ¶ 57.) On November 3, 2015, Sterling informed Damian Clients that it had hired a forensic consultant, AlixPartners, to determine the amount of any adjustments. (DSOF ¶¶ 59-60.) Another meeting between WLRK and the USAO took place on December 2, 2015. (DSOF ¶ 61.) The memorandum WLRK prepared for that meeting stated, in part: "Since we reached out to your office in August, Sterling has completed its investigation into this practice," and "Sterling intends to contact each client that it has determined was affected by this practice and reimburse them the amounts that AlixPartners has determined are owed to them." (DSOF ¶ 63.)

On December 11, 2015, Sterling gave the Sellers notice that it was invoking the indemnification clause. (DSOF ¶ 61; *see also* December Notice, Ex. 22 to Defs.' Stmt. of Material Facts, Dkt. No. 130-13.) Sterling stated that it was bringing both a Third Party Claim and a Direct Claim under the SPA. (*Id.*) Just five days later, on December 16, 2015, Sterling again wrote to its remaining Damian Clients, stating that its investigation was complete, and providing the amount of refund each Client would receive. (DSOF

¶¶ 64-65.) In a December 24, 2015, letter, the Sellers informed Sterling that they refused to indemnify Sterling. (PSOF ¶ 63.)

Sterling claims that its notice was timely under the SPA because it was in communication with the USAO and "sought to avoid interfering with a possible criminal investigation." (Pl.'s Resp. to Defs.' Mot. at 8, Dkt. No. 146.) Sterling explains that it sought indemnification only "[o]nce the USAO declined to pursue a fraud case against Defendants." (PSOAF ¶ 90.)

However, Sterling offers no explanation of how giving notice of its indemnification claim would impede a possible criminal investigation by the USAO. Nor does Sterling indicate that it was instructed by the USAO to conceal Sterling's internal investigation from the Sellers. Furthermore, Sterling was clearly not keeping its investigation a secret, as it had sent several rounds of letters out to its remaining Damian Clients advising them that it was investigating a Damian billing issue. It was reasonable for Sterling to undertake some form of preliminary investigation to ensure that it was making an indemnification claim in good faith, and that it could describe its claim in "reasonable detail" as the SPA requires. (SPA § 8.05(c).) However, the SPA clearly states that Sterling must give notice within 10 days of when it "becomes aware" of its claim. (*Id.*) Sterling was certainly "aware" of its claim by the time it first met with the USAO, in

August of 2015. Therefore, Sterling failed to give timely notice as required under the SPA.

Sterling next asserts that, even if its notice was not timely, the Sellers did not forfeit any rights or defenses, and so still must indemnify Sterling under the SPA § 8.05(c). (*See* SPA § 8.05(c) (The failure to give prompt notice "shall not . . . relieve the Indemnifying Party of its indemnification obligations, *except and only to the extent that the Indemnifying Party irrevocably forfeits rights or defenses by reason of such failure*.") (emphasis added).) The Sellers assert that they forfeited the following rights and defenses as a result of Sterling's failure to promptly give notice of the indemnification claim:

> 1.  The right to contest whether the Clients were indeed entitled to refunds. The SPA gives the Indemnifying Party "the right to participate in, or . . . assume the defense of any Third Party Claim at the Indemnifying Party's expense. . . the Indemnifying Party shall control such defense, and the Indemnified Party shall cooperate in good faith in such defense." (SPA § 8.05(a).)

> 2.  The right to negotiate individual settlements with each Client for less than the full amount claimed. The SPA gives the Indemnifying Party the right to settle a Third Party Claim "without leading to liability or the creation of a financial or other obligation on the part of the Indemnified Party." (SPA § 8.05(b).)

> 3.  The right to participate in the investigation of Direct Claims. The SPA states, "The Indemnified Party shall allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim and the Indemnified Party shall assist the Indemnifying Party's

investigation by giving such information and assistance
. . . as the Indemnifying Party of any of its
professional advisors may reasonably request." (SPA
§ 8.05(c).)

4.   The following defenses: (1) that many of the Client
Contracts contain a clause releasing Damian of
liability; (2) that the Illinois contract law defense of
voluntary payment shields Damian from liability; (3)
that any Client claims about the 2009 change would
violate the Illinois five-year state of limitations for
common law fraud; (4) that the "account stated" defense
shields Damian from liability; and (5) that Damian
established a new course of dealing after the 2009 change
in which Clients acquiesced to the Sunday invoice date.

First, Sterling argues that the Sellers' defenses would not
have been successful. The Court need not delve into this debate,
as the SPA asks only whether the Indemnifying Party "forfeited"
defenses, not whether the Indemnifying Party forfeited defenses
that it was sure to win.

Next, Sterling asserts that the Sellers did not "forfeit
rights or defenses" because the Sellers did not attempt to assert
any rights or defenses after receiving notice on December 11, 2015.
However, months before Sterling had given the Sellers notice, it
had already informed the Clients that they may be entitled to
refunds. (DSOF ¶ 46.) And Sterling had already paid over $650,000
to outside counsel for an investigation into the 2009 change.
(Compl. ¶ 35.) Thus, Sterling had already rendered some of the
Sellers' rights and defenses moot, and it would be a meaningless
formality to say that the Sellers had to assert them after they

had already been forfeited (particularly when the SPA gives no indication that "asserting" those rights or defenses after receiving notice is necessary). Furthermore, the SPA states that "the Indemnifying Party shall have [30] days after its receipt of . . . notice to respond in writing." (SPA § 8.05(c).) Even after giving late notice, Sterling failed to give the Sellers 30 days to respond, and instead proceeded directly to contacting the Clients on December 16, 2015, to inform them of the exact amount of the refund each Client would receive. (DSOF ¶ 65.) Sterling's late notice thus irrevocably forfeited the Sellers' rights under the SPA: to contest whether the Clients were actually entitled to refunds, to negotiate individual settlements, and to participate in the investigation. Therefore, Sterling's failure to give prompt notice relieves the Sellers of their indemnification obligations. The Court grants summary judgment as to Count VIII in favor of the Sellers.

Because Sterling is not entitled to indemnification, it cannot obtain relief under the SPA. Section 8.09 provides, subject to two exceptions that are not relevant, that:

> The *sole and exclusive remedy* with respect to any and
> all claims (other than claims arising from fraud,
> criminal activity or intentional misconduct on the part
> of a party hereto, in connection with the transactions
> contemplated by this Agreement) for any breach of a
> representation, warranty, . . . agreement or obligation
> set forth herein or otherwise relating to the subject

> matter of this Agreement, shall be pursuant to the
> indemnification provisions[.]

(SPA § 8.09 (emphasis added).)

Sterling does not allege any fraud, criminal activity or intentional misconduct in connection with the SPA and concedes that it is "only seeking indemnification" in this litigation. (Pl.'s Resp. to Defs.' Mot. at 5). Because the Sellers are relieved of their indemnification obligation, Sterling is not entitled to its sole form of relief under the SPA. Therefore, Counts I through VII are denied as moot.

## B. The Sellers' Counterclaims

The Court turns to the Sellers' counterclaims. The Sellers assert four counterclaims against Plaintiff: (I) declaratory judgment that the Sellers, not Sterling, are entitled to the amount in escrow, and that Sellers are entitled to pre- and post-judgment interest at 12% annum; (II) Sterling breached the SPA by sending improper notice to the escrow agent; (III) injunctive relief mandating Sterling to instruct the escrow agent to disburse the escrow to Sellers; and (IV) Sterling breached the SPA by failing to pay a required post-closing adjustment of $35,568.49. The Sellers specified that they do not seek summary judgment with respect to Count IV, as Sterling has apparently paid the post-closing adjustment. (*See* Defs.' Memo. at 1 n.1, Dkt. No. 129.)

Thus, summary judgment as to the Sellers' Count IV is denied as moot.

Beyond disclaiming their Count IV, the Sellers did not advance any arguments specifically in favor of their counterclaims in their summary judgment briefing. The Sellers' Motion for Summary Judgment asserts vaguely that they are seeking summary judgment on only one counterclaim (*see* Defs.' Mot. at 2, Dkt. No. 128) ("Sellers are entitled to summary judgment on their Counterclaim"), which they describe as encompassing at least the declaratory judgment action as well as "other relief." (Defs.' Memo. at 1 ("Sellers filed a Counterclaim for declaratory judgment and other relief claiming that Sellers, rather than Sterling, were entitled to the escrowed funds.").). Thus, it appears to the Court that the Sellers are at least seeking summary judgment on their declaratory judgment action.

The Declaratory Judgment Act allows a federal court to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C 28 U.S.C. §§ 2201, 2202. The Act allows a defendant to sue to establish its nonliability. *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 504 (1959). The decision of a district court to grant declaratory relief is discretionary. *NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 577 (7th Cir. 1994). In their Answer, the

Sellers requested a declaration with several specific components: that (a) Sterling is not entitled to indemnification from the escrow; (b) Sterling's December 11, 2015, Letter is "void"; (c) the Sellers are entitled to all amounts held in the Escrow; and (d) the Sellers are entitled to pre- and post-judgment interest at the rate of 12 percent annum. In their motion and briefing, the Sellers only argued the substance of declaration (a): that Sterling is not entitled to indemnification from the escrow. However, the Court has already established the Sellers' nonliability on this issue, in granting summary judgment for the Sellers on Count VIII of Sterling's Complaint. Therefore, such a declaratory judgment would be redundant. Furthermore, Sterling has not advanced arguments for the remainder of the requested declaration, rendering them waived. *See Crespo v. Colvin,* 824 F.3d 667, 674 (7th Cir. 2016) ("[P]erfunctory and undeveloped arguments . . . are waived."). Sellers' motion for summary judgment on its declaratory judgment action is denied.

The Sellers' remaining counterclaims, Counts II and III, are also not mentioned in their summary judgment briefing. Therefore, to the extent Sellers seek summary judgment on these claims, it is denied. *See id.*

## IV.  CONCLUSION

For the reasons stated herein, Sterling's Motion for Partial Summary Judgment (Dkt. No. 134) is denied.  The Sellers' Motion for Summary Judgment (Dkt. No. 128) is granted in part and denied in part as follows: The Sellers are entitled to judgment in their favor as to Count VIII. The Sellers are not entitled to judgment as to their counterclaims.

**IT IS SO ORDERED.**

_____
                    Harry D. Leinenweber, Judge
                    United States District Court

Dated: 6/14/19